GIBSON, DUNN & CRUTCHER LLP
THAD A. DAVIS, SBN 220503
    TDavis@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

ROMMY FLORES, SBN 298770
    rflores@gibsondunn.com
GREGORY BODEN, SBN 301779
    gboden@gibsondunn.com
DANIELLE HESSE, SBN 318321
    dhesse@gibsondunn.com
333 South Grand Avenue, Suite 4600
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

*Attorneys for Respondent Inessa Gonzalez*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER PITZ,<br><br>          Petitioner,<br><br>    v.<br><br>INESSA GONZALEZ,<br><br>          Respondent. | CASE NO. 3:25-cv-04454-LJC<br><br>**RESPONDENT INESSA GONZALEZ'S TRIAL BRIEF**<br><br>Judge:   Hon. Lisa J. Cisneros |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   BACKGROUND ................................................................................................3

    A.    Petitioner's Business Operations ..........................................................7

III.  ARGUMENT.....................................................................................................9

    A.    Legal Standard: Habitual Residence ....................................................9

    B.    The Findings of German Courts as to Custody Have No Place in this Court and Invite the Court to Error ...................................................11

    C.    Germany is not the Children's Country of Habitual Residence ...............14

        1.    Neither Respondent nor Petitioner Intended to Make Germany their Habitual Residence ...............................................14

        2.    The Children Were Not Acclimatized in Germany at the Time of Removal................................................................................22

    D.    Ameliorative Measures .........................................................................24

IV.   CONCLUSION................................................................................................26

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Abbott,*
 560 U.S. 1 (2010) .................................................................................................1, 10, 11, 12

*Alzu v. Huff,*
 2024 WL 3165485 (W.D. Mi. June 24, 2024) ........................................................... 2, 10

*Armstrong v. Manzo,*
 380 U.S. 545 ..........................................................................................................................14

*Barzilay v. Barzilay,*
 600 F.3d 912 (8th Cir. 2010) ............................................................................................12

*Berenguela-Alvarado v. Castanos,*
 820 F. App'x 870 (11th Cir. 2020) ...................................................................................15

*Darin v. Olivero-Huffman,*
 746 F.3d 1 (1st Cir. 2014) .................................................................................. 14, 20, 21

*Daubert v. Merrell Dow Pharms., Inc.,*
 509 U.S. 579 (1993) .............................................................................................................26

*Douglas v. Douglas,*
 2021 WL 4286555 (6th Cir. Sept. 21, 2021) .................................................................10

*Edelstein v. Nelson,*
 2025 WL 1419962 (D. Nev. May 16, 2025) ...................................................................18

*Farr v. Kendrick,*
 824 F.App'x 480 (9th Cir. 2020) ........................................................................ 15, 19, 23

*Gitter v. Gitter,*
 396 F.3d 124 (2d Cir. 2005) ..............................................................................................10

*Golan v. Saada,*
 596 U.S. 666 (2022) .............................................................................................................24

*In re ICJ,*
 13 F.4th 753 (9th Cir. 2021) ...................................................................................... 10, 11

*Karkkainnen v. Kovalchuk,*
 445 F.3d 280 (3d Cir. 2006) ..............................................................................................22

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
**(Cont'd)**

Page(s)

*Keen v. Bowley,*
2024 WL 3259040 (C.D. Cal. July 1, 2024) .................................................................24

*Kenny v. Davis,*
2022 WL 501625 (9th Cir. Feb. 18, 2022) ............................................................ 19, 21

*Monasky v. Taglieri,*
589 U.S. 68 (2020) .................................................................................................Passim

*Murphy v. Sloan,*
764 F.3d 1144 (9th Cir. 2014) .....................................................................................15

*Nisbet v. Bridger,*
2023 WL 6998081 (D. Or. Oct. 24, 2023) ............................................................. 2, 10

*Nisbet v. Bridger,*
124 F.4th 577 (9th Cir. 2024) ......................................................................... 14, 22, 23

*Nowlan v. Nowlan,*
543 F. Supp. 3d 324 (W.D. Va. 2021) ..........................................................................24

*Ollier v. Sweetwater Union High Sch. Dist.,*
768 F.3d 843 (9th Cir. 2014) .......................................................................................25

*Redmond v. Redmond,*
724 F.3d 729 (7th Cir. 2013) .................................................................................. 1, 12

*Rial v. Rijo,*
2010 WL 1643995 (S.D.N.Y. April 23, 2010) .............................................................24

*Roberts v. Roberts,*
2024 WL 5191971 (E.D. Va. Dec. 20, 2024) ....................................................21, 23, 24

*Schwartz v. Hinnendael,*
2020 WL 6111634 (E.D. Wisc. Oct. 16, 2020) ............................................................21

*Smith v. Smith,*
976 F.3d 558 (5th Cir. 2020) .......................................................................................21

*Tenorio v. Vieira,*
2025 WL 1928543 (E.D. N.Y. July 14, 2025) ..............................................................24

*Tsarbopoulos v. Tsarbopoulos,*
176 F. Supp. 2d 1045 (E.D. Wash. 2001) .....................................................................16

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
**(Cont'd)**

Page(s)

*Watts v. Watts*,
 935 F.3d 1138 (10th Cir. 2019) ............................................................................. 2, 10

**Statutes**

22 U.S.C. § 9003(e) ............................................................................................................ 1

International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-9011 (2014) ................... 1

FLA. STAT. § 607.0501 ....................................................................................................... 7

FLA. STAT. § 817.155 ........................................................................................................ 20

**Other Authorities**

Act on the Residence, Economic Activity and Integration of Foreigners in the Federal Territory §
 21(4), Bundesgesetzblatt I at 166 (2020) (Ger.) ............................................................ 20

Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* § IV.14 (6th ed.
 2017) ............................................................................................................................. 13

Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No.
 11,670, 1343 U.N.T.S. 89 ........................................................................................ 1, 11

Gibson, Dunn &
Crutcher LLP

## I.     INTRODUCTION

The two minor children of Petitioner Christopher Pitz and Respondent Inessa Gonzalez—A.D.P. (five years) and A.R.P. (four years) (together "the Children")—should not be forced to return to Germany under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") for one clear and dispositive reason: Germany was not the Children's habitual residence when they left that country with Respondent on March 24, 2025.

The Children's habitual residence is *the* threshold question in this matter, and the Court need not look beyond it. Under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-11, Petitioner must prove by a preponderance of the evidence that: (i) the Children's habitual residence was Germany on the date of removal; (ii) he had rights of custody to the Children at the time of removal; and (iii) he was exercising his rights of custody at the time of removal. *See* 22 U.S.C. § 9003(e); Hague Convention, art. 4, Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 89; *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) ("[T]he Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides.") (internal citations omitted).

Respondent does not dispute that Petitioner was exercising his custody rights as defined by the Hague Convention on the date of removal. Of critical importance, however, the Hague Convention *does not require that a court determine that the left-behind parent was exercising custody rights under the laws of the country of removal*. *Abbott v. Abbott*, 560 U.S. 1, 12 (2010) (declining to use "local law usage" as a basis for its interpretation of a right granted to a parent by a foreign court because "[t]he Convention defines 'rights of custody,' and it is that definition that a court must consult"). Any attempt by Petitioner to inject the findings of German courts into these proceedings *for any purpose* is inappropriate and usurps this Court's authority and invites it to clear error. The court in the place of removal—here, the Northern District of California where Petitioner filed his petition and where the Children currently reside—*must first determine* the question of habitual residence. *Redmond v. Redmond*, 724 F.3d 729, 742 (7th Cir. 2013) (stating "every Hague Convention petition turns on the threshold determination of the child's habitual residence; all other Hague determinations flow from

Gibson, Dunn & Crutcher LLP

1   that decision").[1] The findings of a German court have no place in this inquiry.

2       Respondent need not establish that the Children actually have some other habitual residence—

3   or *any* habitual residence at all; rather, Petitioner must show by a preponderance of the evidence that

4   *Germany was the place of habitual residence.* If Petitioner cannot prove that the Children's habitual

5   residence was Germany, the Children cannot, as a matter of law, be returned there. *Nisbet v. Bridger*,

6   2023 WL 6998081, at *6 (D. Or. Oct. 24, 2023); *see also Watts v. Watts*, 935 F.3d 1138, 1143 (10th

7   Cir. 2019); *Alzu v. Huff*, 2024 WL 3165485, at *5 (W.D. Mi. June 24, 2024).[2]

8       Petitioner's own ties to the U.S. are voluminous, continuous throughout the relevant time

9   period, and clearly not severed. The same is true of his wife and the Children. The record is clear and

10  compelling and demonstrates that Germany is not and has never been the Children's habitual residence.

11  The Children and both parents are U.S. citizens; none are German citizens; the Children do not speak

12  German and are fluent only in Russian and English; neither parent speaks fluent German; Petitioner

13  and Respondent both own and maintained properties in the United States (Petitioner owns at least three

14  properties in the U.S.); Petitioner and Respondent both obtained Michigan driver's licenses in 2023

15  and 2024; Petitioner has at least five business entities located and operating in the United States and

16  has re-affirmed those entities operate in Florida in 2024 and 2025; Petitioner funded the family's day-

17  to-day expenses during the relevant time period with funds from his Florida-based entities; Petitioner

18  does not have any German bank accounts or financial ties and exclusively uses U.S. bank accounts and

19  credit cards; neither Petitioner nor Respondent has ever filed taxes in Germany; Petitioner's residence

20  permit is based on a non-operational business that makes no money at all; and the only job Petitioner

21  has held while *in* Germany was for a Texas-based technology company. Petitioner will not be able to

22  meet his burden at trial and cannot point to *any* documents (or any other evidence) that suggest that he

23  or Respondent intended to abandon their habitual residence in the U.S. to establish a new habitual

24  residence in Germany. A pass to the zoo, a population registration that is *required by Germany* to enroll

25  kids in school, a few months in a preschool with English-speaking teachers, and a few visits to the

26

27  _____

   [1] Petitioner's own German law expert has so testified. Ex. 1670, 101:23–102:11.

28  [2] Petitioner has stipulated that the Children's habitual residence up until April 2024 was the United
    States. FoF ¶ 110.

doctor for two small children do not rise to establishing the high bar for habitual residence under the Hague Convention.

Instead, contemporaneous evidence will show that Respondent agreed to go to Germany *temporarily* to see if it would repair the couple's troubled relationship, which included instances of domestic violence by Petitioner against Respondent. When Petitioner's behavior did not change in Germany after a few months, and following a particular incident on March 19, 2025, where Petitioner verbally attacked Respondent and the young Children, Respondent left Germany and brought the Children back home to the U.S. Despite Petitioner's self-serving *post hoc* declarations that he and Respondent intended to relocate to Germany forever, he can present no evidence to support this contention. Ex. 1264, at 255:23–256:2. Throughout their entire time together in Germany, Petitioner and Respondent held themselves out to the public, state authorities, employers, and the federal government as habitual residents of the U.S. Additionally, Respondent made clear to Petitioner repeatedly that she did not see Germany as the family's home during the relevant period.

Petitioner will not be able to prove by a preponderance of the evidence that Germany was the Children's habitual residence on March 24, 2025.

## II.     BACKGROUND

After meeting in Northern California in 2017, Petitioner quickly persuaded Respondent to uproot her life and follow him to Berlin and around Europe. FoF ¶¶ 11, 13. In early September of 2018, just days before their flight to Florida for their wedding, Petitioner emailed Respondent a prenuptial agreement that waived her right to alimony and required both parties to retain only their own property and income. FoF ¶ 16. Respondent, who was not represented by counsel and did not retain counsel to review the agreement, signed it upon arrival to Florida. FoF ¶ 17. Shortly after their marriage, they returned to Berlin.

In May 2019, while still in Berlin, Respondent became pregnant with their first child, A.D.P. FoF ¶ 19. The parties decided to raise their children in the United States to be near family, and so they returned to Florida before A.D.P. was born and moved into a home owned by Petitioner's parents in Daytona Beach, Florida. FoF ¶¶ 20, 21.

During that time, Petitioner was determined to purchase an apartment in Berlin as an investment

property located near the new Google campus planned in Berlin. *See, e.g.*, FoF ¶ 22. Petitioner financed the transaction by wiring 175,000 euros from one of his Florida-based companies, Triplescoop LLC, to Respondent and arranged for the mortgage to be taken out in Respondent's name. FoF ¶ 23; Ex. 1010 (email exchange reflecting that Respondent's salaried position was key to purchasing investment property). The couple understood that the Berlin apartment was an asset, intended to produce supplementary income. FoF ¶¶ 22; Ex. 1011 (referring to one of the listings as a "[g]ood find for investment!"); Ex. 1005 (email from Petitioner linking to an article about a future Google development in the neighborhood and states that the apartment is in "the right location" and referring to the "investment attractiveness" of it).

After moving to Florida in July 2019, the parties' family continued to grow, and so did the financial imbalance between the two. Prior to A.D.P's birth, the parties agreed that Respondent would step away from her career and become a full-time stay-at-home mother. 7/28/25 Declaration of Inessa Gonzalez in Support of Respondent's Motion for Summary Judgment ("Gonzalez Decl."), ¶ 9. From that point forward, Respondent was solely financially dependent on Petitioner. Ex. 1105, (email from Respondent to Petitioner outlining her financial constraints upon divorce given her then-status as a stay-at-home parent). On February 1, 2020, A.D.P. was born in Florida (FoF ¶ 25), and on July 26, 2021, their second child, A.R.P., was also born in Florida (FoF ¶ 28). After the birth of A.D.P., Respondent's mother moved to Florida to live with the family. FoF ¶ 26. The Children were enrolled in preschool in Florida, had frequent playdates, and attended birthday parties and community gatherings. *See, e.g.*, Exs. 1143, 1518, 1519, 1520, 1521, 1523. The Children's teachers adored the Children and by all accounts, the Children were thriving. Ex. 1135. During their five or so years in Florida, the parties purchased two separate homes in Florida, both of which are still owned by Petitioner through his solely-owned and controlled Florida-based entities. Ex. 1264, at 186:17–188:23. From April to June 2023, the Children spent two months in Uzbekistan and were enrolled in a preschool there. FoF ¶¶ 39–40.

On September 7, 2022, Petitioner was arrested for domestic violence for battery of Respondent. FoF ¶ 29. Petitioner slapped Respondent in the face and yelled at her. *Id.* She attempted to record him, and he grabbed her phone and deleted the video. FoF ¶ 30. Following this incident, the parties

discussed divorce and the possibility of marriage counseling, and Petitioner admitted that he did, in fact, have a problem managing his temper. FoF ¶ 33. Nevertheless, concerned about what effect an arrest and subsequent trial would have on her family, Respondent provided a "Victim Impact Statement" expressing her desire to drop charges against Petitioner. FoF ¶ 36. The charges were dropped shortly thereafter.

Petitioner's controlling behavior toward Respondent continued. Approximately 10 days after the domestic violence incident, Petitioner moved back into the home with Respondent. Ex. 1109. Petitioner then installed cameras throughout the home. Ex. 1515, at -55. Petitioner told Respondent that he knew what Respondent was doing online by monitoring the home's router usage log, and he was able to see who she called and texted because Respondent's cell phone services plans were in his name. Ex. 1648, at -98. On September 22, 2023, Respondent's mother sent a WhatsApp message to Respondent's sister detailing troubling behavior she observed of Petitioner towards Respondent and the Children. She stated, "The children are afraid. Until they are completely grown up and with a broken psyche. He could attack her and they'll get hit too. If [A.D.P.] or [A.R.P.] defends [Respondent]." FoF ¶ 38. This continuing cycle of abuse left Respondent searching for relief—a feeling that would ultimately make her receptive to Petitioner's later promise that a move to Germany would offer a fresh start.

Respondent always understood and intended that any move to Germany would be short-term— indeed, she contemporaneously communicated this to several people. Ex. 1639 (Respondent informs A.D.P.'s teacher on September 19, 2023, that "we are planning to spend *a few months away from Florida*") (emphasis added); Ex. 1134 (Respondent tells a friend on November 11, 2023, that "*we are planning to stay [in Germany] around 3 months just to see if we still like it*") (emphasis added). After years of discord in the marriage, Petitioner unilaterally proposed temporarily relocating to Germany, telling her that a change of scenery to a place where they spent part of their early relationship might improve their marriage. Ex. 1082 at -961-62 (text exchange between Respondent and her sister where her sister entreats her to leave Petitioner on account of Petitioner's abuse, and where Respondent responds that the planned move to Berlin might bring an improvement to their marriage). Respondent believed Petitioner would follow through with changing and agreed to follow him to Germany in April

2024. ECF No. 78-72, at ¶¶ 14, 17.

Moving to Germany did not breathe new life into Petitioner and Respondent's marriage. Immediately preceding the move, on March 6, 2024, Petitioner screamed, "You are a worthless piece of shit. The house is messy. You do nothing all day. I hope you die," and proceeded to throw cat feces from their cat's litter box. Ex. 1648, at -987. On April 18, 2024, upon arriving in Berlin, Respondent asked Petitioner for a few euros to purchase groceries. Petitioner proceeded to take the euros and shove them down Respondent's shirt and berated her by referring to her as a "money whore." *Id.* at -988. Instead of settling into any family home, Petitioner, Respondent, and their two children moved into the Berlin apartment they had purchased in 2019 as an investment property, which was located near the red-light district in Berlin. FoF ¶ 51. Respondent's mother never moved to Berlin and moved back to California; A.D.P. and A.R.P. were devastated. ECF No. 78-72, at ¶¶ 15, 16. Schooling was difficult to arrange, and the Children, who did not speak German, struggled to make friends. Ex. 1140. In short, Petitioner's plan to stabilize the family by temporarily relocating to Germany was already failing.

Throughout the family's time in Germany, Respondent repeatedly made clear that she did not view Germany as a suitable long-term home for the family. Ex. 1226 ("they don't have kita, don't speak German and don't have a proper home in Germany. And they are Asian."). And her concerns deepened as she and the Children experienced microaggressions and racism in Germany. FoF ¶ 61, Ex. 1214, at -742-45 (February 6, 2025, texts from Respondent to Petitioner linking Reddit posts sharing experiences of racism in Germany); Ex. 1602, at -057 (July 21, 2024 texts from Respondent, who spoke Russian to the Children, describing to her mother that "everyone asks me if I have an American passport" and that "[h]ere Americans are like demigods and prestigious. And the Russians are on the dole"). She also expressed to Petitioner that she felt unsafe in the neighborhood because of frequent break-ins. FoF ¶ 62; Ex. 1214, at -772 (February 13, 2025, text message from Respondent explaining that she was scared to drop off her luggage due to apparent break-in). Yet, incredulously, Petitioner now argues that other, deleted messages allegedly show how much Respondent wanted to be in Germany. Ex. 1270 (Pitz Resp. to Gonzalez Interrog. No. 7).

In January 2025, frustrated by their living situation in Germany, Respondent sent Petitioner numerous real estate listings for homes in the U.S., often comparing them to the higher cost and lower

quality housing in Germany, in an effort to speed up the process of finding a new home for the family outside of Germany. FoF ¶ 59. At one point in January 2025, Petitioner sent himself an email, acknowledging in his presumably candid note to self that Respondent wanted to move to California with the Children. FoF ¶ 60. On February 22, 2025, Respondent texted Petitioner stating, "Buying 3mln house in Germany at the current point of our marriage will get us nothing. Zero." FoF ¶ 64. Still, Petitioner mostly ignored Respondent's repeated pleas to leave because she and the Children did not feel at home in Germany.

On March 19, 2025, Petitioner's verbally assaulted Respondent and the Children in front of the family's babysitter. After the babysitter left the home, Petitioner's ranting continued; he repeatedly told Respondent she was a "money whore" and warned his five-year-old daughter not to be like her mother, while also warning his three-year-old son not to marry someone like Respondent. FoF ¶ 65. Including the Children in his attacks on Respondent's character and verbally assaulting them in this way was the last straw; Respondent realized she and the Children needed to leave immediately. 7/28/25 ECF No. 78-72, at ¶ 20. On March 24, 2025, Respondent and the Children flew to California, the only place in the U.S. where Respondent owns a home (purchased before the marriage) and where her mother and sister live. FoF ¶ 66. On the day Respondent and the Children left for California, their reunification visas were rendered void, meaning they no longer have the right to enter Germany for longer than the ninety days offered to the average tourist. ECF No. 55, Ex. 6. The Children spent a total of nine non-sequential months in Germany.

A.    **Petitioner's Business Operations**

Petitioner has founded multiple business entities. Petitioner currently controls and operates no fewer than five active business entities within the U.S. FoF ¶ 93. Each and every one of these entities maintain its principal place of business in Florida. FoF ¶ 94. Throughout the relevant time period (including as of April 30, 2024, and *through* May 1, 2025), Petitioner has held himself out to the Florida Secretary of State as the "registered agent" for these entities, listing and swearing to his own address on those filings as one located in Ormond Beach, Florida. FoF ¶ 95. As a registered agent, Florida law requires that he live in the state of Florida. Fla. Stat. § 607.0501(1) (requiring corporations to "have and continuously maintain in [Florida] . . . [a] registered agent," and if that registered agent is an

individual, they must be "[a]n individual who resides in this state"). On April 1, 2024, Petitioner filed paperwork for his U.S. based entities, listing himself as the registered agent of all the entities and providing a Florida address.[3]

Among these entities, only one is currently operational as a functioning business: 1UP Logistics LLC, which was registered on July 9, 2019, and is based in Florida. FoF ¶ 68; Ex. 1264, at 72:17–73. 1UP Logistics LLC is an active shipping business with a fully operating warehouse in Daytona Beach, Florida with approximately 50 employees. FoF ¶¶ 97, 99. Petitioner has admitted that he is the ultimate decision-maker for the company and its fifty employees. FoF ¶ 100.

Besides 1UP Logistics, only one of the other entities that Petitioner controls (650810 LLC), generates income from a rental property in Florida. Ex. 1264, at 54:21–55:7. Petitioner also started a 501(c)(3) charitable foundation in Florida in 2020, called "100 Healthy Minds," although it is not operational. FoF ¶ 69. It was purportedly launched with the intention of promoting mental health awareness by opening a center in Florida, but aside from receiving an investment of approximately $1 million from Petitioner, the foundation has never hired employees, has never consulted with mental health professionals, has never engaged in fundraising efforts, or otherwise done anything at all to utilize Petitioner's $1 million "investment" into mental health awareness. Ex. 1264, at 110:14–16; 111:24–112:4, 117:10–15.

His only other source of income came from work he performed for Ares Interactive. Petitioner was hired as an independent contractor by Ares , a Texas-based video game development company in May 2024. Working remotely for Ares, on May, 26, 2024 (more than a month after the alleged "permanent" move to Germany) Petitioner submitted a Form W-9 listing one of his Florida entities (650810 LLC) as the payee. FoF ¶ 87. Petitioner signed the Form W-9 as a "United States Person" and listed the relevant address of the payee as being in Ormond Beach, Florida. *Id.* He was terminated by Ares in June 2025. FoF ¶ 88.

---

[3] Petitioner's business addresses are listed as his parents' home in Palm Coast, Florida while his "registered agent" address is a P.O. Box but is misleadingly written to look like a street address. *See* Ex. 1183. This is in violation of Florida's requirements that a registered agent must list a physical address. *See* https://dos.fl.gov/sunbiz/start-business/efile/flllc/instructions/#:~:text=A% 20business% 20entity% 20with% 20an,physical% 20street% 20address% 20in% 20Florida. ("The registered agent must have a physical street address in Florida. Do not list a P.O. Box address.")

Gibson, Dunn &
Crutcher LLP

Petitioner controls two German "entities"—1UP Logistics Operating UG and 1UP Logistics Holding UG. Both were founded in January 2024 ostensibly as a means to gain entry into and reside in the country. But these entities are red herrings and empty shells. 1UP Logistics Holding UG has no purpose other than to hold 1UP Logistics Operating UG, and Petitioner admits that 1UP Logistics Operating UG "does nothing right now" and has done nothing since its inception. FoF ¶ 102. Further, these entities are owned and controlled by Petitioner's Florida entity. Ex. 1264, at 93:8–14.

In January 2024, Petitioner used the newly formed 1UP Logistics Operating UG as a basis for obtaining an entrepreneurial visa that would allow him to stay in Germany longer than ninety days, submitting a business plan for how his purported delivery business would operate and impact the Berlin economy.[4] FoF ¶ 79. But the business plan has proven to be a sham. Petitioner's business plan states that the company will "expand the fleet from an initial 5 vehicles to 15 vehicles by mid-2025" and will hire "at least 15 drivers" to "create[] new jobs and promote[] the local economy." FoF ¶ 83. Petitioner represented in his business plan that he would "initially hire 5 drivers and/or commission them as sole proprietors" starting in July 2024, and "[f]rom October 2024, two more drivers are to be trained every two months so that from October 2025 onwards, 1UP Logistics plans to have 15 permanently employed drivers." FoF ¶ 84. Petitioner also represented that the business would "invest in research and development to develop innovative logistics solutions that will not only increase the efficiency of their deliveries but also contribute to environmental protection and to improve the traffic situation in the capital region of Berlin-Brandenburg." FoF ¶ 85. But **_none_** of this has happened. No drivers were hired in July 2024, and none had been hired by July 2025. Indeed, Petitioner admitted in his July 15, 2025, deposition that not even one aspect of his "business plan" has been put into motion. Ex. 1264, at 93:21–94:1, 94:19–21, 172:3–7, 173:2–174:21.

## III.    ARGUMENT

### A.    Legal Standard: Habitual Residence

Under the Convention, Petitioner must prove: (i) that the Children's habitual residence was

---

[4] Petitioner procured for Respondent and the Children "reunification visas," which would allow them to live with him in Germany while his entrepreneurial visa remains valid and the family stays together. FoF ¶ 80.

Germany on the date of removal; (ii) that he had rights of custody to the Children at the time of removal; and (iii) that he was exercising his rights of custody at the time of the removal. *In re ICJ*, 13 F.4th 753, 761 (9th Cir. 2021). The Hague Convention ***does not require that a court determine that the left-behind parent was exercising custody rights under the laws of the country of origin***. *Abbott v. Abbott*, 560 U.S. 1, 12 (2010) (declining to use "local usage" as a basis for its interpretation of a right granted to a parent by a foreign court because "the Convention's definition of 'rights of custody' controls").

A parent petitioning for the return of a child under the Hague Convention may invoke the protection of the Convention *only if* the child is a "habitual resident" of the country from which he or she was removed. *Monasky*, 589 U.S. at 72. The petitioner in a Hague Convention case bears the burden of proof to prove by a preponderance of the evidence that the child was the habitual resident of a country and has been wrongfully removed to or retained in a different country. *Gitter v. Gitter*, 396 F.3d 124, 131 (2d Cir. 2005). Critically, "a child's residence in a particular country can only be considered 'habitual' when 'her residence there is more than transitory'" and requires "some degree of integration by the child in a social and family environment." *Douglas v. Douglas*, 2021 WL 4286555, at *4 (6th Cir. Sept. 21, 2021) (quoting *Monasky*, 589 U.S. at 76).

The Convention ***does not*** require that a respondent prove that a child may have some other habitual residence. *See Watts v. Watts*, 935 F.3d 1138, 1147–48 (10th Cir. 2019) ("The Convention does not require a district court to determine where a child habitually resides [ ] [i]nstead, the Convention requires a district court to determine whether the child habitually resides in the location that the petitioner claims"); *see also Nisbet*, 2023 WL 6998081, at *6 (holding that children who moved repeatedly between two countries "lacked a habitual residence altogether"); *Alzu v. Huff*, 2024 WL 3165485 (W.D. Mo. June 24, 2024) (holding that the Hague Convention does not require every child to have a habitual residence).

The "totality of circumstances" rubric includes: (1) a "change in geography combined with the passage of an appreciable period of time"; (2) where the Children have lived throughout their lives; (3) the length of time that Children have lived in a country; (4) whether the parties viewed their time in a country as temporary; (5) the citizenship and immigration status of the Children and parents; (6) whether the Children speak the language of the country; (7) whether the Children have acclimated;

and (8) the purposes and intentions of the parents. *Monasky*, 589 U.S. at 78 n.3.

**B.    The Findings of German Courts as to Custody Have No Place in this Court and Invite the Court to Error**

Respondent does not dispute prongs (ii) or (iii) *under the Convention* and agrees that Petitioner was exercising his custody rights under the Hague Convention on March 24, 2025. *In re ICJ*, 13 F.4th at 761. However, Respondent disputes prongs (ii) and (iii) as determined under German law. But findings by a German court have no bearing here. Petitioner invites this Court to error by submitting that prongs (ii) and (iii) must be determined by the removed-from country; that is not so. The court need not make any choice of law determination. *Abbott v. Abbott*, 560 U.S. at 12. Only whether Germany was the Children's habitual residence on the date of removal is at issue before this Court. Petitioner seeks to rely on parallel German court proceedings to presumably prove that Petitioner had custody rights under German law. In those proceedings, a German family court *has already assumed* that the Children's habitual residence is Germany and that Petitioner has custody rights over the Children. FoF ¶¶ 164, 166. Two of Petitioner's designated experts, Dr. Andreas Hanke and Dr. Peter Favaro, have referenced and relied on the German proceedings. *See* FoF ¶ 159; Ex. 1641, at -312 (Dr. Favaro's report stating, "t[here are German orders which have been rendered which do proffer findings of child abduction against the mother."). Dr. Hanke's cites the German court orders and claims that Respondent "breached the Father's rights of custody to the children under German law." FoF ¶ 162. Dr. Favaro also claims that the Children were "wrongfully removed." FoF ¶ 161; Ex. 1615, at 26:19–27:14. In short, while Petitioner frames the German proceedings as proof of custody rights, they serve as a Trojan horse to introduce a foreign court's findings on habitual residence, an issue that this Court must decide independently.

The Children's habitual residence is *the* threshold question in this case. At issue are the Children's habitual residence, which parent had custody rights, and whether Petitioner maintained custody rights at the time of removal. *In re ICJ*, 13 F.4th 753, 761 (9th Cir. 2021). Of critical importance, the Convention leaves custodial decisions to the courts of the country of habitual residence. Hague Convention, art. 19. Thus, before reaching the question of custody rights, this Court must decide which jurisdiction has the authority to answer that question, namely the Children's habitual residence.

Gibson, Dunn & Crutcher LLP

*Redmond v. Redmond*, 724 F.3d 729, 742 (7th Cir. 2013) ("[E]very Hague Convention petition turns on the threshold determination of the child's habitual residence; all other Hague determinations flow from that decision."). This court does so without regard to the determinations of foreign jurisdictions. *Barzilay v. Barzilay*, 600 F.3d 912, 921–22 (8th Cir. 2010) (recognizing that the Convention is "not a treaty on the recognition and enforcement of [foreign] decisions on custody") (internal quotation marks and citations omitted). Any attempt to import a foreign court's habitual residence into this case would usurp this Court's authority under the Convention and should be wholly rejected.

Petitioner seeks to introduce findings from the German proceedings to reverse the proper sequence of this Court's Hague Convention analysis. According to Petitioner's designated expert on German law, Dr. Hanke, a parent awarded custody rights under German law has the "right to determine the child's habitual residence." FoF ¶ 163. But at the same time, Dr. Hanke maintains that a child's habitual residence must *already be* Germany for a German court to have the authority to decide custody rights. Ex. 1264, at 24:9–25:2; 40:24–25 ("I was told to assume that the children's habitual residence was in Germany"). In effect, giving weight to the German court's findings closes the loop on circular reasoning, ultimately collapsing the Convention's two-step inquiry into one and letting the foreign custody order dictate habitual residence. This cannot be so.

Petitioner attempts to do what courts explicitly forbid: "[A] parent may *not* use the Convention to *alter* the child's residential status based on a legal development in the parent's favor." *Redmond*, 724 F.3d at 742, 747 (ultimately finding that the children's habitual residence was not Ireland despite an Irish court's order granting custody rights to the petitioner in Ireland). The Court should resist Petitioner's attempt to lure it into an inappropriate and convoluted debate over foreign custody law. What a foreign court decided with respect to custody rights *under German law* does not matter because what guides this Court's determination is U.S. law. *Abbott v. Abbott*, 560 U.S. 1, 12 (2010) (declining to assess custody rights based on "local law usage," and instead looking to precedent in the U.S. because "**our own legal system has adopted conceptions of custody that accord with the Convention**[]" (emphasis added)). This Court's task is clear: assess habitual residence by considering the totality of the circumstances, particularly with respect to parental intent and the Children's acclimatization to their environment. *Monasky*, 589 U.S. at 78; *see also Redmond*, 724 F.3d at 740

(stating that "the Convention is not a vehicle for resolving competing jurisdictional or merits claims in the underlying custody dispute"). Petitioner invites this court to commit clear error by straying from the path that the Supreme Court has laid in *Monasky*.

Petitioner's reliance on the German proceedings is made more troubling because Petitioner's expert Dr. Hanke refused to testify as to what evidence Petitioner presented to the German courts under overly-broad assertions of privilege over the entirety of the German proceedings. Ex. 1670, at 51:25–52:3, 57:16–18, 66:5–7, 68:24–69:2. Dr. Hanke refused to answer questions that are not subject to privilege generally and certainly not under U.S. jurisprudence including refusing to answer when he was retained by Petitioner, when he first spoke with him, whether Respondent was personally served, and even as to statements he made on Petitioner's behalf in open court. *Id.* He did so even though the German proceedings are cited throughout the record as "confirm[ing]" Dr. Hanke's opinion that Respondent "breached the [Petitioner's] rights of custody to the Children under German law." ECF No. 64, at ¶ 29. Petitioner waived the right to withhold that information under attorney-client privilege and the work product doctrine when he called his own attorney as an expert witness. *See* Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* § IV.14 (6th ed. 2017) ("If an attorney is designated as a witness, any factual work product may thereby be waived. Opinion work product is waived only when the attorney is designated as an 'expert' witness."). Dr. Hanke himself testified that Germany exercised international jurisdiction in this case "based on the habitual residence of the Children [being Germany]" and that he "***was told to assume that the children's habitual residence was Germany, correct***." FoF ¶ 164. (emphasis added). Petitioner seeks that this Court take as dispositive that a German court has already determined the Children were wrongfully removed—but this is a naked attempt at pulling the wool over this Court's eyes. Petitioner's own expert was told by *U.S. counsel* for Petitioner to assume both that Germany was the Children's habitual residence and that the Children were wrongfully removed for purposes of his analysis under German law. Ex. 1670, at 46:5–15 (Q So it is your opinion that Ms. Gonzalez wrongfully removed the children from Germany; correct? A ***No, I was provided with the assumption***. What is the German law on custody rights before the children were, ***U.S. counsel told me, wrongfully removed*** because ***that was the -- the essence of my statement was under the system that the children were wrongfully removed***, what has been the

RESPONDENT INESSA GONZALEZ'S TRIAL BRIEF
CASE NO. 3:25-cv-04454-LJC

custody rights under German law.) (emphasis added). In fact, Dr. Hanke admitted that he "cannot form an opinion on anything that is litigated in the United States." *Id.* 45:21–23.

Critically, here, the absence of due process protections underscores the impropriety of this Court accepting anything related to the German proceedings. Respondent was "served" with Petitioner's filings by mail at a German address provided by Petitioner and his counsel (where Petitioner resides) despite Petitioner knowing to a certainty she was not there. There is no requirement for personal service of the orders from the German proceedings such that Respondent would have an opportunity to be heard, *see* Ex. 1670, at 75:9–11, which was another thing Dr. Hanke refused to testify about claiming privilege. *Id.* at 79:14–21. When Respondent finally became aware of the ruling and responded substantively, her appeal was time-barred. *See* Ex 1640, at -290 (7/9/2025 German Court Ruling); Ex. 1670, at 80:5–24. Petitioner is thus attempting to use rulings that assume facts *this Court* is required to find are already properly satisfied and which Respondent has had no chance to challenge in any case. *Armstrong v. Manzo*, 380 U.S. 545, 552 ("A fundamental requirement of due process is the opportunity to be heard," "which must be granted at a meaningful time and in a meaningful manner."). Respondent was not afforded due process and had absolutely no opportunity to respond substantively to ex parte proceedings by Petitioner that assumed Germany as the Children's habitual residence. The German proceedings are an inappropriate basis for any part of this Court's analysis.

## C.    Germany is not the Children's Country of Habitual Residence

### 1.    Neither Respondent nor Petitioner Intended to Make Germany their Habitual Residence

Parental intent is the central indicator when assessing where a child habitually resides when children are so young that they cannot meaningfully acclimate to their surroundings as they lack the material and psychological means to decide where they will reside. *Monasky*, 589 U.S. at 78; *Darin v. Olivero-Huffman*, 746 F.3d 1, 11 (1st Cir. 2014) (quoting *Mozes*, 239 F.3d at 1076). The Ninth Circuit has similarly emphasized that "the intentions and circumstances of caregiving parents are relevant considerations" where the Children are "unable to acclimate due to [their] very young age." *Nisbet v. Bridger*, 124 F.4th 577, 586 (9th Cir. 2024) (evaluating the habitual residence of children aged two and four years old). Parental intent is not the sole determining factor in establishing habitual residence, but

it is an important one—especially when children are too young to make their own decisions *See Berenguela-Alvarado v. Castanos*, 820 F. App'x 870, 873 (11th Cir. 2020) (where the appellate court found the lower court's analysis of habitual residence sufficient because it did not rely solely on an "actual agreement" between the parties). With a mother who never expressed an intent to remain in Germany and a father with deep roots in the U.S., the Children's parents did not have an intent to reside in Germany.

### a. Respondent did not intend to make Germany the family's habitual residence.

Respondent had no intention of relocating her family to Germany permanently or for more than a short period of time. Petitioner's assertion that Respondent intended to move to Germany rests entirely on conjecture. Despite extensive communications between the parties, including thousands of text messages between Petitioner and Respondent, Petitioner has not, and cannot, identify a single message, email, or document in which Respondent expressed a desire to make Germany the family's permanent home at any point. Ex. 1264, at 255:23–256:2. That silence speaks volumes in the face of a voluminous and years-long record of communication between the two parties.

The evidence of Respondent's intent that does exist indicates that neither party ever intended to permanently relocate to Germany. For her part, Respondent was clear that Germany was not a permanent home (*see infra* at 15), and courts give significant weight to a parent's statements that a location is only a temporary place to live when assessing whether it constitutes the child's habitual residence. *Farr v. Kendrick*, 824 F.App'x 480, 481–82 (9th Cir. 2020) (finding no habitual residence based on testimony, email exchanges, and conversations expressing a parent's intent not to permanently stay in the country); *Murphy v. Sloan*, 764 F.3d 1144, 1152 (9th Cir. 2014) (concluding that there was no settled parental intent and therefore no habitual residence in a country where the respondent hoped to stay only for a "trial period").

Respondent's statements before the relocation to Germany demonstrate an intent to move to Germany only temporarily. On September 19, 2023, Respondent told her child's teacher that "we are planning to spend a few months away from Florida." FoF ¶ 42. In November 2023, she told a friend, "we are planning to stay around 3 months just to see if we still like it." FoF ¶ 43. Respondent made

Gibson, Dunn &
Crutcher LLP

clear to multiple third parties that she clearly saw the move as temporary from the outset. Respondent's agreement to try Germany for a short time is understandable given that it was a product of her hope that the move might ease Petitioner's abuse and repair her marriage. Respondent's agreement to temporarily relocate to Germany was driven by her desire to make her marriage work after years of conflict and Respondent's coercive tactics. After Petitioner's September 7, 2022, arrest for domestic violence for battery of Respondent (FoF ¶ 29) Respondent had to deal with Petitioner locking doors and surveilling her every move, through cameras installed in the house just days after the arrest and monitoring her router usage logs. Ex. 1515, at -712, -755; Ex. 1648, at -898. The law is clear that if any supposed intent to reside in Germany (even for a short time as here) was the product of coercion, that intent cannot support a finding of habitual residence. *See  See Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045, 1055 (E.D. Wash. 2001) (where Respondent mother was physically and verbally abused, isolated, complied with the demands of her domineering husband, was living in a country other than her own, and had very limited social connections, the court found that Respondent mother never acclimated to Greece so "she cannot be said to have made Greece the habitual residence of her children"). Moving to Germany under the coercive circumstances Respondent was experiencing does not amount to an intent to move; it amounts to a hope to put a band aid on a troubled marriage.

Soon after arriving in Germany, she quickly realized that the family's attempt at living in Germany had failed, so she decided to look for a home. Ex. 1180, at -025 (Respondent writing to her mother on July 19, 2024: "Chris we don't like it, we live here and we have a lot of apartments rented for 3 months and there are people moving in and out all the time . . . This place is so touristy"). For instance, on February 9, 2025, Respondent sent Petitioner several listings of large 3–5-bedroom homes in Nevada and Arizona. FoF ¶ 59. Respondent immediately followed up in the same conversation to include German house listings, making clear that she was comparing how much more affordable it was to buy something in the U.S. that had the amenities the family was seeking, including better weather. Ex. 1214, at -756–61. Respondent sends Petitioner a house listing in Germany for $2.5 million that "looks OK but rather modest" and is comparable to a "600k home in USA [given that it has] no backyard.") *Id.* at -759.

Part of the reason why she wanted to find a home outside of Germany was because of the racism

she and the Children experienced. She expressed this. Numerous chat exchanges between Respondent and Petitioner reflected her unease with raising her non-Caucasian kids in Germany. *See, e.g., id.* at -739 (Respondent noting that the Children "don't speak German and don't have a proper home in Germany [and] they are Asian"); *Id.* at -731–33, -740–745 (messages from Respondent to Petitioner about how the school demographics in San Ramon, CA had a much larger Asian population of students in obvious contrast to Berlin and sharing online discussions regarding racism experienced in Berlin by Asians).

In sum, there is a complete absence of any express intent on behalf of Respondent (and Petitioner) to permanently relocate to Germany. Respondent repeatedly expressed her desire to move back to the U.S. and raise the Children there. Respondent's lack of intent means the Children's habitual residence cannot be Germany.

Petitioner claims that Respondent deleted critical Telegram messages that somehow negate all the other contemporaneous evidence that she did not want to live in Germany. Ex. 1270 (Pitz Resp. to Gonzalez Interrog. No. 7). But this is a red herring. Petitioner can provide no evidence whatsoever that these alleged smoking gun messages were deleted by Respondent. Telegram messages can be deleted by either party (Telegram, *Telegram FAQ*, hhttps://telegram.org/faq (last visited July 25, 2025)), and the only person with a history of deleting videos and messages is Petitioner. FoF ¶ 30. Additionally, the parties have produced contemporaneous evidence of their communications during the entirety of the relevant time period, none of which supports this contention of the smoking gun that isn't.

Incredibly, Petitioner also now claims that Respondent and he purchased an apartment in Berlin in 2019 with the intent of making that the permanent family home once they had children. Ex. 1270 (Pitz Resp. to Gonzalez Interrog. No. 4). Yet, upon finding out that they were expecting their first child, Petitioner and Respondent *moved to Florida* instead. At the time that they left Germany in July 2019, Petitioner was actually employed there on a long-term contract that he sought to terminate two years early. FoF ¶ 20. At the time that they left Germany in July 2019, Respondent was gainfully employed by Groupon in Berlin and held a Blue card. TX1358. A Blue Card under the EU can easily lead to permanent residency in Germany. Additionally, if the family sought to make Berlin their permanent home, having their children born there would be the more common-sense choice; as this Court knows,

17

a child born to U.S. citizen parents is still a U.S. citizen if born abroad. Further, the family did not move back to Berlin once they had their second child, either. At all times, they remained in Florida.[5] Thus, Petitioner's self-serving and backfilled narrative that the 2019 purchase showed intent to live forever in Germany as of 2024 strains credulity and is easily disproven.

### b. Petitioner's strong ties to the U.S. also demonstrate a lack of intent to habitually reside in Germany.

Here, virtually all of Petitioner's ties are to the U.S. Petitioner owns and maintains at least three separate U.S. properties. Petitioner also admits that he owns and maintains at least three properties—two in Daytona Beach, Forida and one in Sterling Heights, Michigan. Ex. 1264, at 183:24–184:9, 186:17–187:1. Petitioner and Respondent maintain Michigan driver's licenses. Id. at 194:18–20. Courts have considered parents retaining a driver's license issued in the U.S. as a factor determining that the U.S. continued as the Children's habitual residence. *See Monasky*, 589 U.S. at 88 (Thomas, J., concurring) (noting that judges should consider, among other factors, "the presence or absence of . . . driver's licenses"); *see, e.g.*, *Edelstein v. Nelson*, 2025 WL 1419962, at *5 (D. Nev. May 16, 2025) (retaining a U.S. driver's license despite living abroad "demonstrates that [new country] was a temporary living situation").

During the relevant time period, Petitioner has worked for only two companies, both U.S.-based and operating. 1UP Logistics LLC, a solely-owned and controlled entity of Petitioner's is registered in Florida and has no commercial connection to Germany. FoF ¶ 96. Petitioner has been and continues to be the decisionmaker for 1UP's operations at its warehouse in Florida. FoF ¶ 100. 1UP Logistics LLC generates income by shipping products in an Amazon warehouse located in Daytona Beach, Florida. FoF ¶ 99. That Florida-based company is the only entity that Petitioner controls that generates income, besides two entities that draw rental income—also in Florida. Ex. 1264, at 29:22–30:7, 46:9–11, 54:21–55:9, 93:13–14, 97:21–23. While in Germany, Petitioner continued to receive direct deposits from his Florida entity, 1UP Logistics LLC. FoF ¶ 52. Ares Interactive, a Texas-based video game development company hired Petitioner as an independent contractor in May 2024. Working remotely for Ares, on

---

[5] Petitioner has stipulated that up to April 2024, the Children's habitual residence was the United States. FoF ¶ 110.

RESPONDENT INESSA GONZALEZ'S TRIAL BRIEF
CASE NO. 3:25-cv-04454-LJC

Gibson, Dunn & Crutcher LLP

May, 26, 2024, Petitioner submitted a Form W-9 listing one of his Florida entities (650810 LLC) as the payee. FoF ¶ 56, 87–88. Petitioner signed the Form W-9 as a "United States Person" and listed the relevant address of the payee as being in Ormond Beach, Florida. *Id.* He was terminated by Ares in June 2025. *Id.*

Petitioner also pays living expenses with money he wires from Florida. Between April and December 2024, three € 40,000 wire transfers were made from Triplescoop LLC, one of Petitioner's entities registered in Florida, to Respondent. FoF ¶ 58; Ex. 1179 (April 22, 2024, wire transfer); Ex. 1197 (August 28, 2024, wire transfer); Ex. 1211 (December 17, 2024, wire transfer).

During his time in Germany, Petitioner continued to use *only* his American credit cards and bank accounts. Ex. 1102, at -543–569, -616, -621, -632, -637, -643, -676. He has provided no evidence that he maintained a German bank account at any time between April 2024 and March 24, 2025. Ex. 1168, at -537 (stating that Petitioner did not have an EU bank account as of March 2024); *see Farr* 824 Fed. App'x. at 481–82 (finding no habitual residence in Mexico while the petitioner maintained a U.S. bank account and U.S. automobile insurance). Petitioner simply maintains a "Wise" money transmitting account which he uses in Germany. *See* Ex. 1117 (noting that Wise accounts are particularly useful for non-residents in the EU). And on June 7, 2024, nearly two months after the family allegedly moved to Germany forever, Petitioner made a deposit of $243,031.39 at a Wells Fargo branch in Daytona Beach, Florida. FoF ¶ 57.

### c.    Petitioner maintains almost no financial connections to Germany.

Petitioner's entire presence in Germany is built on a house of cards. The two related entities Petitioner points to as tying him to Germany (1UP Logistics Holding UG and 1UP Logistics Operating UG) are non-operational. 1UP Logistics Holding UG has no purpose other than to hold 1UP Logistics Operating UG, and Petitioner admits that 1UP Logistics Operating UG "does nothing right now" and has done nothing since its inception. FoF ¶ 102. Further, these entities are owned and controlled by Petitioner's Florida entity. Ex. 1264, at 93:8–14. Petitioner admitted that he has purchased no vehicles in Germany, hired no employees, signed no contracts with third parties, and has earned no revenue whatsoever since April 2024. FoF ¶¶ 103–104. Petitioner's lack of business ties to Germany further undermine his claims that he intended to settle there. *See Kenny v. Davis*, 2022 WL 501625, at *1 (9th Cir. Feb. 18,

19

Gibson, Dunn & Crutcher LLP

2022) (declining to recognize habitual residence in Ireland when the petitioner was working in the U.S.).

Petitioner's legal right to remain in Germany is based on these non-operational German entities. To support his visa application, Petitioner submitted a business plan for the sham German entities referenced above. FoF ¶ 79. Petitioner has admitted that he has done nothing to execute on this business plan. Ex. 1264, at 183:11–13. Since he has taken no steps towards implementing that business plan, the plan does not, and cannot, support his continued presence in Germany. *Id.* at 171:20–176:12; 182:1–183:13. Under German law, continuation of this visa is premised on whether "the current activity, based in particular on its success and duration, gives reason to expect that the business will continue." Act on the Residence, Economic Activity and Integration of Foreigners in the Federal Territory § 21(4), Bundesgesetzblatt I at 166 (2020) (Ger.) (emphasis added). Petitioner is also subject to penalties for not alerting the German authorities to his changed (or more accurately, initially and continuously fraudulent) basis for being present in Germany. Section 82. Abs. 6 S. 1 AufenthG. A child's habitual residence does not shift when their prior residence has not been abandoned. *Darin*, 746 F.3d at 11 (holding that a shift in habitual residence requires an intent to abandon one's prior habitual residence). Petitioner lacks the legal right to remain in Germany. In fact, the record appears to suggest that Petitioner actively worked to have as small of a financial and legal footprint in Germany as possible.

### d.    Petitioner holds himself and his family out as U.S. habitual residents to the IRS, the State of Florida, and the State of Michigan.

Petitioner holds himself out to the government and the public as a habitual resident of the U.S. Since Petitioner's move to Germany in April 2024, he has filed nearly a dozen annual reports with the state of Florida for his U.S. businesses representing that he resides in Florida, and these filings are done under threat of felony charges. Fla. Stat. § 817.155; Ex. 1238 (May 1, 2025, filing with Florida Secretary of State for TRIPLESCOOP LLC); Ex. 1183 (April 30, 2024, filing with Florida Secretary of State for TRIPLESCOOP, LLC); Ex. 1239 (May 1, 2025, filing with Florida Secretary of State for 212020 COMPANY); Ex. 1184 (April 30, 2025, filing with Florida Secretary of State for 212020 COMPANY); Ex. 1181 (April 30, 2025, filing with Florida Secretary of State for 650810 LLC) COMPANY); Ex. 1237 (May 1, 2025, filing with Florida Secretary of State for 650810 LLC);

Gibson, Dunn & Crutcher LLP

1   Ex. 1181 (April 30, 2024, filing with Florida Secretary of State for 1UP LOGISTICS LLC); Ex. 1236

2   (May 1, 2025, filing with Florida Secretary of State for 1UP LOGISTICS LLC); Ex. 1185 (April 30,

3   2024, filing with Florida Secretary of State for CPMC1 LLC); Ex. 1240 (May 1, 2025, filing with

4   Florida Secretary of State for CPMC1 LLC); Ex. 1235 (May 1, 2025, filing with Florida Secretary of

5   State for 100 HEALTHY MINDS FOUNDATION, INC.). Petitioner either knowingly filed multiple

6   false documents with the Florida Secretary of State (a felony) or views himself as a resident of Florida.

7       Petitioner has strongly resisted producing any of his tax filings with the IRS, likely because

8   they would serve as further evidence that he holds himself out as a U.S. person.

9       The facts of this case are comparable to those in which courts have held that a child's habitual

10  residence did not shift because the prior residence was never abandoned—Petitioner retained his ties

11  to the U.S. without creating meaningful new ones in Germany. *See Smith v. Smith*, 976 F.3d 558, 563

12  (5th Cir. 2020) (where the appellate court held that despite the Children living in Argentina for two

13  years, Argentina was not the Children's habitual residence because neither parent had ever abandoned

14  their prior habitual residence in the U.S.). Courts recognize that when an individual has not formed an

15  intent to abandon a prior country, time spent in a new country cannot establish a new habitual residence

16  regardless of its duration. *Darin*, 746 F.3d at 11 (holding that a shift in habitual residence requires an

17  intent to abandon one's prior habitual residence). Courts regularly reject claims of habitual residence

18  in a new country where a petitioner maintains ongoing ties outside of the country at issue. *See Roberts

19  v. Roberts*, 2024 WL 5191971, at *6 (E.D. Va. Dec. 20, 2024) (considering that "the parties maintained

20  American bank accounts and credit cards . . . [and] continue to pay taxes in the United States" in finding

21  a temporary move to the U.K. did not change the Children's U.S. habitual residence); *Schwartz v.

22  Hinnendael*, 2020 WL 6111634, at *3 (E.D. Wisc. Oct. 16, 2020) (determining that Mexico was not

23  the child's habitual residence because the parents retained U.S. driver's licenses and U.S. bank

24  accounts, and they continued to file taxes in the U.S.). Petitioner's lack of business ties to Germany

25  further undermine his claims that he intended to settle there. *See Kenny v. Davis*, 2022 WL 501625, at

26  *1 (9th Cir. Feb. 18, 2022) (declining to recognize habitual residence in Ireland when the petitioner

27  was working in the U.S.).

28      There is nothing to suggest that Petitioner had any intent of abandoning his (or the family's)

habitual residence in the U.S., and all of Petitioner's claimed ties to Germany are illusory and based on nothing but his own, unsubstantiated assertions. Indeed, Respondent appears to have taken pains to ***avoid*** creating these ties with Germany. Petitioner's embedded presence in the U.S. refutes any argument that he ever intended to make the family's habitual residence Germany and it was not so at the time of removal.

### 2. The Children Were Not Acclimatized in Germany at the Time of Removal

The Children's virtually non-existent connections to Germany suggest that they were not acclimatized to Germany, and thus not habitually residents there. Again, the Supreme Court has recognized that acclimatization carries little weight when children are too young to form meaningful connections to a place, as they are here. *See supra* Section III(C)(1). However, parental intent cannot be the sole determinant. *Monasky*, 589 U.S. at 78. Here, however, all other factors weighed by the courts in Hague cases also support that the Children's habitual residence was not Germany. During the limited time they spent in Germany, the Children did not become "firmly rooted" in their surroundings. *Karkkainnen v. Kovalchuk*, 445 F.3d 280, 292 (3d Cir. 2006) (stating that courts should look to the "child's conduct and experiences" and determine whether they show the child was "firmly rooted in her . . . surroundings, not merely . . . acculturated to a country's language or customs"). But even assuming acclimatization plays some role in the habitual residence analysis, the fact that the Children had no close friends—they had but two playdates with other children of foreign nationals and limited extended family in Germany, were not German citizens, and did not speak the German language fluently should be decisive in demonstrating that they never integrated into life in Germany. Further, at least one of the Children has expressed that they did not like Germany. FoF ¶ 130; Ex. 1658, at 26:59–27:17; Ex. 1659, at 6:22–7:08.

During their short nine months in Germany, the Children were never integrated into German culture. They attended a *multilingual* preschool where teachers spoke English; took some German language courses; went to the zoo; and received medical care there. Ex. 1180, at -976 (noting that the preschool in Germany had "three English teachers who speak English German"). But these do not equate to acclimatization. *See, e.g.*, *Nisbet*, 124 F.4th at 588 (holding that physical presence, including attending school and receiving medical care, in a country for two years and four months did not make

Gibson, Dunn & Crutcher LLP

that country the Children's habitual residence). In fact, in 2023, the Children spent just two months in Uzbekistan, and they were enrolled in a preschool there during that short time as well. FoF ¶ 40.

All other facts point to no acclimatization. The Children did not make close friends or otherwise form social connections in Germany. While the Children may have had a few playdates over the 10-month period, the number paled in comparison to the active social lives they had in Florida. Ex. 1143 (discussing a playdate and birthday party in Florida); Ex. 1518 (text thread with children's friends in Florida); Ex. 1519 (invitation to A.D.P.'s birthday in Florida); Ex. 1520 (Florida friends); Ex. 1521 (Florida friends); Ex. 1523 (Florida friends); *see Nisbet* 124 F.4th at 585 (finding no habitual residence in the absence of friends or other social ties). The Children do not have any other family in Germany apart from Petitioner's father, whom Petitioner only moved to Germany in December 2024 on a three-month visa while they were grieving the loss of Petitioner's mother. Ex. 1602, at -104–05 (describing Petitioner's father, whom the Children do not spend much time with, and his stay in Germany "for now for 3 months on a visa and then we'll see"); *see Nisbet*, 124 F.4th at 585 (noting the absence of additional familial connections as weighing against habitual residence). Neither Petitioner, Respondent, nor their children are German citizens. FoF ¶¶ 2, 5; *see Farr*, 824 Fed. App'x. at 482 (relying on the respondent and her children's lack of citizenship in a country as a basis for finding no habitual residence). Instead, all of them—including Petitioner's father—are American citizens. The lack of connections in Germany stands in stark contrast to their life in the U.S., where they live with their maternal grandmother and near their aunt and cousins with whom they have always been very close. This case lacks the basic indicia of the children's acclimatization to Germany.

Particularly relevant here is *Roberts v. Roberts*. The parents in that case took steps to acclimate their children far beyond those taken by Petitioner and Respondent here. 2024 WL 5191971 at *2, *6-*7 (the family moved for the father's job, secured a lease for a home, shipped their belongings, obtained drivers licenses, obtained health insurance, enrolled their children in school, participated in extracurricular activities, and befriended other families during their ten months in England). Yet, that was not enough to establish habitual residence in light of the parents maintaining U.S. bank accounts and real estate, discussing living in places in the U.S., maintaining their U.S. driver's licenses, and continuing to pay taxes in the U.S. All of those facts are present here. Moreover, the *Roberts* court

found that marital stability undercut a finding of habitual residence. *Id.* at *6. Petitioner and Respondent moved to Germany in an attempt to reconcile after continued discord in the marriage following Petitioner's arrest for domestic violence. When the abuse continued in Germany, it was evidence that their trial had failed, so Respondent returned home with her children. While the father in *Roberts* was in the military, which that court noted was of import, the assignment was for at least three years, and the family could have decided to abandon the United States as its habitual residence but did not. *Id.* At *5. Similarly here, a temporary move does not mean that one cannot ship belongings, attend preschool, or clean up the closets in a family's *investment property*; it simply means that a parent wants their child to be comfortable during an extended stay in an unfamiliar place.

## D.    Ameliorative Measures

If the Court ultimately determines that the Children were habitual residents of Germany on March 24, 2025, the Court should impose ameliorative measure. Respondent has dropped her formal "grave risk" defense under Article 13(b) of the Convention, but the question of grave risk is separate from the question of whether the court should impose ameliorative measures. *Golan v. Saada*, 596 U.S. 666, 677 (2022). Courts routinely provide for ameliorative measures upon a child's return. *Nowlan v. Nowlan*, 543 F. Supp. 3d 324, 363–64 (W.D. Va. 2021) (requiring arrangements for the child to attend therapy in its return order, despite no finding of grave risk); *Keen v. Bowley*, 2024 WL 3259040 at *51 (C.D. Cal. July 1, 2024) (holding that it was "within [the court's] discretion" to consider "mitigation measures" in ordering the child's return). Courts can consider ameliorative measures raised by the parties or ones demanded by the "circumstances of the case." *Golan*, 596 U.S. at 679. Measures are case dependent, but range from financial support to an agreement to rent an apartment in a specific part of town, to therapy for the children, the parent or parents, or both. *See, e.g.*, *Tenorio v. Vieira*, 2025 WL 1928543 at *22 (E.D. N.Y. July 14, 2025) (requiring the petitioner to pay for certain expenses); *Rial v. Rijo*, 2010 WL 1643995 at *3 (S.D.N.Y. April 23, 2010) (requiring the petitioner to rent an apartment in the center of town to ensure security). But ultimately, "any consideration of ameliorative measures must prioritize the child's physical and psychological safety." *Golan v. Saada*, 596 U.S. at 680.

Petitioner has engaged in abusive conduct toward Respondent. Most notably, on September 7,

2022, Petitioner was arrested for domestic violence for battery of Respondent. FoF ¶ 29. And on September 22, 2023, Respondent's mother sent a WhatsApp message to Respondent's sister saying, "[t]he children are afraid. [ ] He could attack her and they'll get hit too. If [A.D.P.] or [A.R.P.] defends [Respondent]." FoF ¶ 38. On September 15, 2023, the parties had an argument, and when Petitioner wanted to have sex and respondent refused, Petitioner proceeded to push Respondent down on the bed and yelled, "I hate you. You are a snake and two-faced bitch. Ever since you called the police, every day I wish you were dead. You are a piece of shit." TX1648 at -987. Respondent was also susceptible to financial coercion given that Respondent had stepped away from her career to become a full-time stay-at-home mother, leaving her without an independent source of income for nearly five years. Gonzalez Decl., ¶ 9. The abusive relationship between the parties implicates the need for court-ordered protections.

Petitioner hopes to rely on the biased and flawed opinion of Dr. Peter J. Favaro ("Dr. Favaro") to rebut this history of abuse. Respondent has moved to exclude Dr. Favaro's report and testimony because the Court should evaluate whether ameliorative measures are required without regard to these methodologically flawed and biased opinions. Resp's Mot. *in Limine* No. 1. The report and testimony are based on interviews of the Children and an observation of Petitioner interacting with his children during a visitation on July 27, 2025. The supposed purpose of this examination was to determine whether the Children "are triggered in the presence of their father, and specifically whether they show signs of post-traumatic stress disorder, anxiety or fear in the presence of their father." ECF No. 62-1, at ¶ 6.

Although Petitioner intends to rely on Dr. Favaro's report and testimony, that evidence lacks sufficient foundation and was unduly influenced by the Petitioner. Dr. Favaro's report and testimony are based on an observation where he could not ***hear*** significant interactions between Petitioner and his children, and only took Petitioner's word on what happened during that visit, rather than asking the children or either of the two supervisors present during the visit (FoF ¶¶ 121, 127, 138), so Dr. Favaro did not have a sufficient factual basis for his opinion. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (finding that testimony based on "superficial inspections" was not enough to render expert testimony admissible). Petitioner also undermined the integrity of Dr. Favaro's

25

Gibson, Dunn &
Crutcher LLP

methodology and scientific procedure when he went to a "steak dinner" with Dr. Favaro the evening before the observation and interviews of his children (FoF ¶118), and further when he inappropriately contacted Dr. Favaro via text message *while Dr. Favaro conducted his observation* of Petitioner and his children. Ex. 1298, at 400:20 (originally "No" corrected to "Yes" via Errata Sheet dated July 31, 2025); FoF ¶ 141; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993) (holding that expert opinions are required to be "ground[ed] in the methods and procedures of science"). Dr. Favaro's opinion and supporting documents lack the requisite reliability to serve as a basis for a determination on ameliorative measures, so Petitioner should not be able to offer them as evidence.

If the Court orders the children's return to Germany (which it should not do), the Court should use its inherent authority to require ameliorative measures, including but not limited to: instructing Mr. Pitz to consent to converting the DVTRO to a DVRO in California; a 52-week batterer treatment course for Mr. Pitz; ongoing counseling for Mr. Pitz after treatment; supervised visitation in California during the treatment course; consent to a DVRO or similar protection under German law before return; confirmation of legitimate immigration and visa status in Germany for Mr. Pitz and the children.

## IV.    CONCLUSION

Because the Children's habitual residence is not Germany, the petition should be denied.


DATED: August 12, 2025                    Respectfully submitted,

                                          GIBSON, DUNN & CRUTCHER LLP


                                          By: */s/ Thad A. Davis*
                                          _____
                                          Thad A. Davis, Bar No. 220503


                                          *Attorneys for Respondent Inessa Gonzalez*