UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER PITZ,<br><br>    Petitioner,<br><br>v.<br><br>INESSA GONZALEZ,<br><br>    Respondent. | Case No. 25-cv-04454-LJC<br><br>**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 78, 92 |

## I.  INTRODUCTION

The parties to this case under the Hague Convention on the Civil Aspects of International Child Abduction both move for summary judgment. The Court held a hearing in conjunction with the pretrial conference on August 20, 2025. For the reasons discussed below, both parties' Motions are DENIED as to the core issue of whether the children were habitual residents of Germany at the time of their removal and return to the United States earlier this year. That issue must and will be resolved at trial. Petitioner's Motion is GRANTED with respect to summary adjudication that *if* the children were habitual residents of Germany, Petitioner had and was exercising rights of custody under German law immediately prior to the children's removal.[1]

## II.  BACKGROUND

The following summary is not intended as a complete recitation of the record, or even of all potentially relevant evidence in the record. It is instead intended only as context for the Court's analysis below. While that analysis is not limited to the evidence specifically recited here, it is limited to *evidence*. The Court does not rely on assertions in the parties' briefs that lack

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

evidentiary citations, or that are not supported by the evidence they cite.[2]

Petitioner Christopher Pitz and Respondent Inessa Gonzalez met in California in 2017 and soon thereafter moved in together in Berlin, Germany. ECF No. 78-72 (Gonzalez Decl.), ¶ 2; ECF No. 92-1 (Pitz Aff.), ¶ 2. They married in Florida in 2018 and moved there in 2019, when Respondent was pregnant with their first child. ECF No. 78-72, ¶¶ 5, 6, 8.

They also purchased a condominium in Berlin 2019, in Respondent's name. ECF No. 92-1, ¶ 3. Petitioner states that the parties "shared [an] understanding that the family would one day return to [the condominium in] Berlin to raise [their] children there." *Id.* Respondent asserts in her Motion that the parties intended that to be an investment property, ECF No. 78 at 9, but does not state that directly in her declaration, ECF No. 78-72, and the documentary evidence on which she relies seems to suggest that the parties were at least considering purchasing a property as a place to live. For example, Respondent submits a late-2018 email exchange between the parties and a real estate broker (who may have specialized in investment properties) indicating that the parties were considering purchasing both investment properties and properties where they might live. ECF No. 78-18; *see also*, *e.g.*, ECF No. 78-10 (email between the parties, in which Petitioner discussed the status of current leases as bearing on the "investment attractiveness" of a thirteen-unit building); ECF No. 78-13 (email exchange in which Respondent inquired as to the lease term of an occupied apartment listed for sale, the listing agent stated that the apartment "would not likely be suitable for you if you intend to live in the apartment" because the tenants

---

[2] As a few examples: Petitioner asserts in his Motion that in December 2024, his "84 year old father also moved to Berlin to be close to the family, where he resides less than 400 meters from the family's home," but cites no evidence to support that. ECF No. 92 at 7. Respondent's Motion asserts that the parties' "apartment was located near the red-light district in the Mitte area of Berlin," ECF No. 78 at 13, but the exhibit she cites is an email to a daycare center asserting that the family "will move to the Westend district (Tharauer Allee)," with no reference to Mitte or any red-light district. ECF No. 78-73. In the next sentence of Respondent's Motion, she asserts, "Schooling was difficult to arrange, and the children, who did not speak German, struggled to make friends." ECF No. 78 at 13. The exhibit she cites is an email exchange with a relocation consultant from before the parties moved to Germany, in which the consultant was "quite pleasantly surprised that there have been this many offers so far" from preschools, and which says nothing about the children struggling to make friends—neither at that time, nor several months later when they were actually living in Germany. ECF No. 78-38. For that final point, Respondent only later offered evidence (in the form of her reply declaration) that the children "never made close friends" in Germany. ECF No. 113-2, ¶ 9.

2

1    would be protected from eviction for ten years, and Petitioner responded to Respondent, "Ugh, but
2    we can still make it work!").
3          The parties' first child, A.D.P., was born in Florida in early 2020, and the parties agreed
4    that Respondent would stop working and instead "becomes a full-time stay-at-home mother."
5    ECF No. 78-2, ¶¶ 9–10. Petitioner supported her financially, wiring her money from a Florida
6    entity he owns, Triplescoop LLC, which "does not generate income." *Id.* ¶ 19. That practice
7    continued when the parties later moved to Germany. *Id.* Their second child, A.R.P., was born in
8    Florida in 2021. *Id.* ¶ 11.
9          In 2022, Petitioner was arrested on charges for domestic violence. ECF No. 113-2, ¶ 2.
10   Respondent did not wish to press charges. *See* ECF No. 113-1 at 5, 134, 136. The parties
11   discussed the possibility of divorce. *See, e.g.*, *id.* at 10–11.
12         The parties made plans to move back to Berlin. Petitioner states that in 2022 and 2023, the
13   parties took two "joint planning trips to Berlin," in which they "toured neighborhoods, evaluated
14   school options, and discussed long-term housing and relocation logistics." ECF No. 92-1, ¶¶ 4–5.
15   They and their children also visited Uzbekistan (where the children have family) "from April 2023
16   to June 2023." ECF No. 113-2, ¶ 4. The children attended preschool and received medical care
17   while there. *Id.*
18         Petitioner made two additional trips to Berlin in December 2023 and March 2024 "to help
19   coordinate property preparation and finalize details of the relocation." ECF No. 92-1, ¶ 6.
20   Starting in the fall of 2023, Respondent engaged with a Facebook group focused on parenting in
21   Berlin, and the parties "engaged with relocation consultants to research and evaluate suitable
22   kindergartens" there. ECF No. 92-1, ¶¶ 7, 9 & Ex. 1. According to Petitioner, "Respondent
23   applied for kindergarten and school spots in Berlin well in advance of [their] move to Germany."
24   *Id.* ¶ 73.
25         Petitioner states that the parties "bought a house in Germany at the end of 2023." ECF No.
26   92-1, ¶ 72. Respondent states that "Petitioner finalized the purchase of a second property in the
27   Westend district of Berlin" in "early 2024," to which she "never had the opportunity object" and
28   never agreed to renovate or move into. ECF No. 78-2, ¶¶ 12–13. When they moved to Germany

3

in 2024 it appears that they moved into the condominium that they had purchased earlier, not to that second property, but that issue is not relevant to the outcome of the present Motions. *See* ECF No. 92-1, ¶ 13 (discussing "the family's living space at the condominium").

Also in the fall of 2023, Respondent told A.D.P.'s teacher in Florida that the family was "planning to spend a few months away from Florida," ECF No. 78-32, and told a friend that they were "planning to stay around 3 months just to see if [they] still like it," ECF No. 78-33.[3]

The family flew to Berlin on April 17, 2024 using one-way tickets. ECF No. 92-1, ¶ 12. They attended an immigration appointment the following week to obtain long-term visas. *Id.* ¶ 18. Petitioner was issued a three-year visa tied to self-employment, and Respondent obtained a dependent vias. *Id.* ¶¶ 22–23. The parties registered the children for residency status necessary to attend school and access healthcare. *Id.* ¶¶ 24–25 & Ex. 3. The parties' household belongings later arrived in Germany from Florida in a shipping container in June of 2024. ECF No. 92-1, ¶¶ 15–16.

Both children (who speak English and Russian) attended a bilingual preschool starting in May, where according to Petitioner, they "developed meaningful proficiency in the German language," as well as classes at a "Saturday Russian-German school in Berlin." *Id.* ¶¶ 27–29. Petitioner states that in "February 2025, ADP was placed in an advanced German-language group by her instructors, reflecting her accelerated progress and fluency." *Id.* ¶ 34. Respondent, on the other hand, states that the children "never learned German." ECF No. 113-2, ¶ 9.

---

[3] Petitioner objects to Respondent's use of her own past statements, arguing that they are inadmissible hearsay. ECF No. 92 at 20. "A statement of the declarant's then-existing state of mind (such as motive, intent, or plan)," however, is not excluded by the hearsay rule. Fed. R. Evid. 803(3). Petitioner also objects to Respondent's use of evidence without proper authentication by someone with personal knowledge, citing the Ninth Circuit's decision excluding evidence submitted with an attorney's declaration in *Orr v. Bank of America*, 285 F.3d 774 (9th Cir. 2002). ECF No. 92 at 20. "But the *Orr* standard, requiring evidence to be authenticated and admissible in its present form for it to be considered at the summary-judgment stage, was abrogated in 2010 by amendments to Federal Rule of Civil Procedure 56. Instead, Rule 56 mandates only that the *substance* of the proffered evidence would be admissible at trial." *David v. Betts*, 734 F. Supp. 3d 1050, 1079 (D. Haw. 2024) (cleaned up), *aff'd sub nom. David v. Leskovic*, No. 24-3889, 2025 WL 2017459 (9th Cir. July 18, 2025). The parties dispute whether authentication is required for evidence offered by a respondent in a Hague Convention proceeding such as this one. *See* 22 U.S.C. § 9005. Assuming for the sake of argument that authentication is required, the Court presumes that Respondent could authenticate her own messages at trial.

The parties explored options for the children's continuing education in Berlin elementary schools. ECF No. 92-1, ¶¶ 35–36. The children received regular medical care while in Germany. *Id.* ¶¶ 50–53.

According to Petitioner, the children enjoy the weather in Germany, and engage in activities like ballet and music classes, sledding, visiting the zoo and aquarium, and attending soccer games and seasonal events. ECF No. 92-1, ¶¶ 42, 45–49. Respondent states that "the children attended one German market and A.D.P. attended one soccer game with Petitioner." ECF No. 113-2, ¶ 8. According to Respondent, "the children were devastated to be in Germany" because Respondent's mother, who had lived with them in Florida and was "intimately involved in their lives since birth," did not move to Germany with them and instead moved to California. ECF No. 78-72, ¶¶ 15–16. The parties disagree as to whether the children made friends, or at least close friends, while in Germany. *See* ECF No. 92-1, ¶ 31; ECF No. 113-2, ¶ 9.

Respondent hoped that the move to Berlin would improve the parties' tumultuous marriage. ECF No. 78-72, ¶ 14; *see also* ECF No. 78-31 at 64 (stating in September 2023, in response to her sister urging her to leave the marriage, "I have a feeling [B]erlin will be for the better"). "It did not." ECF No. 78-72, ¶ 14. Respondent describes an incident of abusive conduct in December 2024 as follows:

> On or around December 7, 2024, Petitioner and I got into an argument related to my belief that Petitioner and his father had let my mother-in-law die in a nursing home. Petitioner lunged for me, grabbed me around the neck and shoved me down on the bed, calling me a "piece of shit human being and wife," told me he wished I were dead and called me a "whore."

ECF No. 78-2, ¶ 18.

Respondent and the children traveled to California from December 29, 2024 to January 17, 2025, returning to Berlin at the end of that trip. ECF No. 92-1, ¶ 41. Afterwards, Respondent sent Petitioner listings for houses and information about neighborhoods in the United States, as well as houses in Germany that she implied were overpriced or undesirable. *See, e.g.*, ECF No. 78-39 at 5–8, 28–38. On February 1, 2025, Petitioner sent himself the following email documenting a conversation in which Respondent stated her desire to move back to the United States:

5

> On Jan 30 [I]nessa had a fit because I wouldn't not [sic] buy her a 1.5MM house in CA. She demanded I buy her a house so she and the kids could live there without me. Her behavior has been erratic and wild since returning from CA and she refuses to get help. Her reason was it's too cold in Berlin and our apartment is too small. Even though this is the apartment she insisted we keep a few months earlier. She threw her purses and wedding ring at me and said "take them back and sell them for money. I don't want them you have them."

ECF No. 78-42.

Respondent describes another incident of abusive conduct in March of 2025 as follows:

> On March 19, 2025, Petitioner verbally assaulted me and the children in front of the family's babysitter where Petitioner told me I was a "money whore" and warned his four year old daughter not be like her mother. After an incident of intense verbal abuse in March 2025 by Petitioner against me, I realized my children and I needed to leave immediately.

ECF No. 78-2, ¶ 20.

Respondent traveled with the children to California on March 24, 2025, without telling Petitioner that she would do so. ECF No. 92-1, ¶¶ 62–64. According to Petitioner, she had listed a home she owned in California for sale when the family moved to Germany, but "delisted the property after she unilaterally removed the children." ECF No. 92-1, ¶ 84. Petitioner initiated this action to return the children to Germany.

Both parties have at least some financial ties to the jurisdiction that the opposing party contends is the children's habitual residence. According to Petitioner, Respondent maintains a German bank account and receives bills in her name in Berlin. ECF No. 92-1, ¶¶ 96–97. Respondent cites Petitioner's deposition testimony that he owns several business entities in Florida and has continued to list himself, with a Florida address, as the registered agent for those businesses. *See* ECF No. 78 at 10 (citing numerous passages of ECF No. 78-3 (Pitz Dep.)). Petitioner founded two German business entities, on which he based his visa application, but they have not begun operating and currently "do[] nothing." *See* ECF No. 78-3 at 170:18–174:21. Petitioner's two moneymaking businesses are a shipping and logistics company and an entity that collects rent from a residential property, both of which are in Florida. *Id.* at 54:13–55:7, 72:9–73:16.

Earlier this month, a German court determined that the children are habitually resident in

1    Berlin, Respondent wrongfully took the children to the United States without Petitioner's consent,

2    Petitioner "is entitled to determine the children's residence," and Respondent must return the

3    children to Petitioner, with "custody proceedings . . . to be completed in Berlin" after they are

4    returned.  ECF No. 92-9 at 4, 11–12 (certified translations of German court documents).

5    Respondent was represented by counsel in the German legal proceedings.  ECF No. 92-1, ¶ 66.

6    Petitioner asserts that those decisions are of "great significance and assistance to this Court's

7    analysis," but does not argue that this Court is bound by or should merely defer to the German

8    court's determinations, including as to habitual residence.

9        As a final note on the evidentiary record:  Some of the exhibits offered by the parties are in

10   German (a language that this Court cannot read), *e.g.*, ECF No. 92-15, or consist of machine

11   translations of German documents, *e.g.* ECF No. 78-1, ¶ 8 & Ex. 7.  "[F]ederal court proceedings

12   must be conducted in English." *Ruiz v. Oliveira*, No. 17cv1914-DMS (NLS), 2019 WL 3082164,

13   at *9 (S.D. Cal. July 15, 2019) (quoting *United States v. Rivera-Rosario*, 300 F.3d 1, 5 (1st Cir.

14   2002)), *recommendation adopted*, 2019 WL 4643603 (S.D. Cal. Sept. 24, 2019).  District courts

15   routinely exclude from evidence documents in other languages submitted without certified

16   translations (and also reject automated translations offered without sufficient certification of

17   accuracy).  *E.g.*, *id.* at *10 n.7; *Tex-V. Co., Ltd v. Shein US Servs., LLC*, No. CV 23-5151-

18   AB(EX), 2024 WL 4868331, at *1 (C.D. Cal. Sept. 19, 2024); *Maslic v. ISM Vuzem d.o.o.*, No.

19   21-cv-02556-BLF, 2024 WL 3408217, at *7 (N.D. Cal. July 11, 2024); *In re Ingenu, Inc.*, No. 20-

20   03779-LT, 2024 WL 3634243, at *35 (Bankr. S.D. Cal. Feb. 13, 2024); *Martini E Ricci Iamino*

21   *S.P.A.--Consortile Societa Agricola v. Trinity Fruit Sales Co.*, 30 F. Supp. 3d 954, 964 (E.D. Cal.

22   2014) ("Further, M & R's motion relies in part on documents that are in the Italian language. The

23   documents are not translated into English by any person shown to be a competent translator.

24   Thus, the documents are not admissible and cannot be considered.").  The Court therefore

25   generally disregards German-language documents offered without certified English translations, as

26   well as uncertified machine translations of such documents.  If the parties intend to rely on such

27   documents at trial, they must provide competent, certified translations, unless both parties stipulate

28

either to the accuracy of an uncertified translation or to the meaning of a particular document.[4]

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

To prevail on a motion for summary judgment, a movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630–31 (9th Cir. 1987). However, once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

*Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

## IV. ANALYSIS

### A. Overview of the Hague Convention

"Under the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention), Oct. 25, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11 (Treaty Doc.), a child wrongfully removed from her country of 'habitual residence' ordinarily must be returned to that country." *Monasky v. Taglieri*, 589 U.S. 68, 70–71 (2020). "The Convention defines a 'wrongful' removal or retention as one that breaches existing custody rights 'under the law of the State in which the child was habitually resident immediately before the removal or retention' if those rights 'were actually exercised' or 'would have been so exercised but for the removal or retention.'" *Golan v. Saada*, 596 U.S. 666, 670 n.1 (2022) (quoting the Convention).

---

[4] The Court reserves its authority to consider documents that contain untranslated German text to the extent that the import of the document is sufficiently apparent without need to read the German text. *E.g.*, ECF No. 92-1, ¶ 80 & Ex. 10 (German residence permits, containing some untranslated German text).

8

> The Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings. Upon the child's return, the custody adjudication will proceed in that forum. To avoid delaying the custody proceeding, the Convention instructs contracting states to 'use the most expeditious procedures available' to return the child to her habitual residence.

*Monasky*, 589 U.S. at 72 (citations omitted).

The United States has implemented the Convention through the International Child Abduction Remedies Act (ICARA), which authorizes both state and federal courts to consider petitions under the Convention to return a child to a foreign country. 22 U.S.C. § 9003. A petitioner must "establish by a preponderance of the evidence . . . that the child has been wrongfully removed or retained within the meaning of the Convention." *Id.* § 9003(e)(1).

In sum, to establish a prima facie case for the return of the children, the Petitioner must show by a preponderance of the evidence that: (1) the children at issue were under the age of 16; (2) the children were removed from their habitual residence in a foreign country that is a signatory to the Convention; (3) Petitioner, as the left-behind parent, had rights of custody at the time of their removal; and (4) Petitioner was exercising those rights or would he have exercised them, but for the removal or retention of the children. *Gomez v. Gonzalez*, 771 F. Supp. 3d 1150, 1157 (W.D. Wash. 2025) (citing 22 U.S.C. § 9003 and Convention, art. 4).

In this case, the first element is undisputed. The parties vigorously contest the second element. The degree to which the parties dispute the third and fourth elements is more complicated, as discussed further below.

### B. Habitual Residence

The primary issue in dispute in this case is whether the children were habitual residents of Germany at the time that Respondent brought them to California in March of this year. For the reasons discussed below, the Court DENIES both parties' Motions for Summary Judgment as to that issue.

#### 1. Caselaw Addressing Habitual Residence

The Supreme Court held in 2020 "that a child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 589 U.S. at 71. Taking into account the Convention's expedited procedures, a district court must form "a quick impression gained on a

1  panoramic view of the evidence," and its decision is reviewed deferentially for clear error on
2  appeal. *Id.* at 82, 84.

3  Habitual residence is not equivalent or reduceable to "formal legal concepts like domicile
4  and nationality." *Monasky*, 589 U.S. at 79. "There are no categorical requirements for
5  establishing a child's habitual residence . . . ." *Id.* at 80. Even for an infant, "mere physical
6  presence" is not dispositive of habitual residence, but a petitioner need not show "actual
7  agreement" by both parents that the child would remain in the country at issue. *Id.* at 81.

8  The Supreme Court has quoted with approval an explanatory report to the Convention that
9  frames a child's habitual residence by reference to "the family and social environment in which
10 [the child's] life has developed." *Monaksy*, 589 U.S. at 77 (quoting the report; alteration in
11 original). "What makes a child's residence habitual is therefore some degree of integration by the
12 child in a social and family environment," such that it is "[t]he place where a child is at home, at
13 the time of removal." *Id.* (cleaned up). "[A] caregiving parent's ties to the country at issue are
14 [also] highly relevant." *Id.* at 80 n.4.

15 In a recent decision, drawing heavily from the Supreme Court's clarification of the issue in
16 *Monasky*, the Ninth Circuit described the standard for habitual residence as follows:

> In general, a child's habitual residence is "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291–92 (3d Cir. 2006) (citation omitted) (cited with approval in *Monasky*, 589 U.S. at 77, 78, 140 S.Ct. 719). "This approach considers a child's experience in and contacts with her surroundings, focusing on whether she developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places she encountered." *Id.* at 292 (cleaned up) (citation omitted); *see also Monasky*, 589 U.S. at 77, 140 S.Ct. 719 (noting the Hague Convention's explanatory report referred to a child's habitual residence as "the family and social environment in which [the child's] life has developed" (alteration in original) (citation omitted)).
>
> "For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Monasky*, 589 U.S. at 78, 140 S.Ct. 719. Such facts include "geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections with the people and places," "language proficiency," and "location of

> personal belongings." *Id.* at 78 n.3, 140 S.Ct. 719 (citation omitted). "Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations." *Id.* at 78, 140 S.Ct. 719.
>
> "No single fact, however, is dispositive across all cases." *Id.* Courts determine a child's habitual residence by looking at "the totality of the circumstances specific to [each] case," *id.* at 71, 140 S.Ct. 719, and they must be "sensitive to the unique circumstances of [each] case and informed by common sense," *id.* at 78, 140 S.Ct. 719 (citation omitted). "The bottom line: There are no categorical requirements for establishing a child's habitual residence." *Id.* at 80, 140 S.Ct. 719; *see also id.* at 78, 140 S.Ct. 719 (quoting *Karkkainen*, 445 F.3d at 291, for the proposition that the "inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case").

*Nisbet v. Bridger*, 124 F.4th 577, 584 (9th Cir. 2024). In "rare" circumstances, a court may properly find that children "lack[] habitual residence altogether." *Id.* at 587.

One Ninth Circuit case cited multiple times in Petitioner's Motion affirmed a finding of no habitual residence in Ireland, despite a child having lived there for around three years. *Murphy v. Sloan*, 764 F.3d 1144 (9th Cir. 2014). Both the district court and the Ninth Circuit relied, however, on then-binding Ninth Circuit precedent holding that "[w]here a child has a 'well-established habitual residence . . . the agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence, such as when there is effective agreement on a stay of indefinite duration.'" *Id.* at 1150 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir. 2001)). That *Mozes* test has been abrogated by the Supreme Court's decision in *Monasky*, which held that a shared agreement by the parents is not always necessary to establish habitual residence. *See Monasky*, 589 U.S. at 76; *Nisbet*, 124 F.4th at 589 (describing *Monasky* as "explicitly abrogating the Ninth Circuit's holding[] in *Mozes* . . . that placed greater weight on shared intentions of parents than on children's acclimatization"); *In re ICJ*, 13 F.4th 753, 765 (9th Cir. 2021) (citing *Monasky* for a different point of law, and noting its abrogation with respect to the test for habitual residence). *Murphy*'s holding in direct reliance on *Mozes* has therefore also been abrogated. *Murphy* and other Ninth Circuit precedent predating the 2020 *Monasky* decision and applying the now-defunct *Mozes* standard thus provide little if any useful guidance for determining habitual residence in the

11

case at hand.[5]

Even after *Monasky*, however, the Ninth Circuit has held that foreign stays of multiple years do not always establish habitual residence. In *Farr v. Kendrick*, 824 F. App'x 480 (9th Cir. 2020), a non-precedential unpublished decision, the Ninth Circuit affirmed a denial of a father's petition to return children to Mexico where the record reflected that the respondent mother "viewed the move [to Mexico] as temporary and believed the family would remain [there] for three to five years," the petitioner father had at times discussed plans to return to the United States, and both parents retained familial and financial ties to the United States. 824 F. App'x at 482.

In *Nisbet*, a precedential opinion, the Ninth Circuit affirmed the district court's determination that two young children were not habitual residents of Scotland, despite both having lived there for multiple years and one having been born there. 124 F.4th at 581. The mother in that case was a U.S. citizen, the father was a British citizen, and the two met while both vacationing in New York in 2012. *Id.* The mother moved to Scotland that year, where the father had been living, and became pregnant with the first child in 2017. *Id.* The father always intended to return to his parents' home in Jersey, a British Crown Dependency,[6] and the couple moved there in 2017, though they had also considered moving to the United States. *Id.* at 581–82. Their first child was born in Jersey in 2018. *Id.* at 582. The father suffered severe medical and mental health complications, and the mother remained in Jersey to care for him until August 2018, when she moved back to Scotland with the first child. *Id.* at 582. They returned to Jersey early the next year. *Id.* Later in 2019, the father killed his mother (the children's grandmother). *Id.* He was arrested and sentenced to indefinite psychiatric confinement. *Id.* The mother, who wished to

---

[5] The First Circuit's decision in *Darin v. Olivero-Huffman*, 746 F.3d 1 (1st Cir. 2014), which Respondent cites for the principle that "when an individual has not formed a settled intent to abandon a prior country, time spent in a new country cannot establish a new habitual residence regardless of its duration," ECF No. 78 at 21, also relies heavily on *Mozes* and may not be consistent with *Monasky*. *See Darin*, 746 F.3d at 11.

[6] The Court notes, solely for the purpose of understanding the *Nisbet* opinion, that the Ninth Circuit appears to have implicitly treated Jersey as a separate country from Scotland for the purpose of assessing habitual residency, although it also sometimes references both as components of the United Kingdom. This Order has no reason to second-guess that approach, or otherwise to wade into potentially complex questions of the relationship between these British Commonwealth jurisdictions.

12

1  return to the United States but lacked healthcare coverage and believed she was not permitted to
2  return while the father's criminal case was pending, moved back to Scotland, where the second
3  child was born in February of 2020. *Id.* Soon after, the COVID-19 pandemic restricted air travel
4  and closed national borders. *Id.* The children attended nursery school in Scotland but made no
5  friends or meaningful acquaintances. *Id.* at 583. They had occasional visits and frequent (but
6  short) video calls with their father, who remained in a psychiatric facility, though the calls did not
7  consistently hold their attention. *Id.* In June of 2022, the mother and children moved to the
8  United States. *Id.*

9  In finding that the children were not habitual residents of Scotland—moreover, that they
10 lacked any habitual residence at all—the district court and the Ninth Circuit placed significant
11 weight on their lack of friends or family there, and their limited contact with their father, who in
12 any event was no longer in Scotland. *Id.* at 585. The district court and Ninth Circuit also
13 considered the mother's "intention and circumstances" of unwillingly remaining temporarily in
14 Scotland due to considerations beyond her control. *Id.* at 586–87. The Ninth Circuit found no
15 clear error in the district court's conclusion, based on the totality of the circumstances, that
16 Scotland was not the children's habitual residence, even while "agree[ing] with the dissent that a
17 selection of facts in the record of this case [could] be read to support the conclusion that [the
18 children] habitually resided in Scotland, especially if one credits [the father's] testimony over [the
19 mother's]." *Id.* at 589.

20                    **2.      Respondent's Unpersuasive Contentions of Law**

21 Respondent asserts that habitual residency "*requires* parental intent, together with other
22 strong indications of acclimation to make a country a child's habitual residence." ECF No. 78 at
23 16 (emphasis added; original emphasis omitted). To the extent that Respondent contends, as she
24 appears to, that habitual residency requires a shared intent by both parents for a child to remain in
25 a given country, that is inconsistent not only with *Monasky*'s specific holding that "agreement
26 between the parents on where to raise their child" is not necessary to such a finding, but also with
27 its broader admonition that "[t]here are *no* categorical requirements for establishing a child's
28 habitual residence." *Monasky*, 589 U.S. at 71, 80 (emphasis added). Parental intent for a child to

1  remain in a country is a relevant consideration, but a lack of such intent is not dispositive as a
2  matter of law, as Respondent appears to concede elsewhere in her Motion. *See* ECF No. 78 at 17
3  ("To be clear, Respondent does not argue that intent is the sole determining factor in establishing
4  habitual residence [but] simply that it is an important one . . . .").

5        Respondent also cites *Monasky* for the proposition that a "child's residence is 'habitual'
6  only when the residence is more than temporary." ECF No. 78 at 16. But the majority opinion in
7  *Monasky* never uses the word "temporary," and instead states that "residence in a particular
8  country can be deemed 'habitual,' however, only when her residence there is more than
9  *transitory*." 589 U.S. at 76 (emphasis added). Black's Law Dictionary—which *Monasky* cites for
10 a different purpose in the sentence immediately preceding the quotation at issue—defines
11 "transitory" as: "Passing from place to place; capable of passing or being changed from one place
12 to another." TRANSITORY, Black's Law Dictionary (12th ed. 2024). Though Black's includes
13 "transitory" as a possible meaning of the term "temporary," the definition of the latter also
14 includes "[l]asting for a time only." TEMPORARY, Black's Law Dictionary (12th ed. 2024).
15 The term "transitory" thus does not entirely overlap with the meaning of the term "temporary."
16 "Transitory" conveys a state of being in flux, whereas a temporary existence may be stable, even if
17 it is not permanent. To illustrate the distinction, a plan to spend a decade in a given country before
18 moving elsewhere might be considered "temporary," but could hardly be construed as "transitory"
19 because the plan involved a meaningful degree of stability. Such an extended (but ultimately
20 *temporary*) stay would also be consistent with the sort of acclimatization that *Monasky* and other
21 precedent treat as a touchstone of the habitual residence inquiry. Consequently, a highly
22 temporary state may be considered transitory, but not all temporary states are so in flux that they
23 are transitory.

24       Just as some of Respondent's arguments based on *Monasky* are unpersuasive, her reliance
25 on *Nisbet* does not establish that summary judgment is warranted. In *Nisbet*, the Ninth Circuit
26 treated the mother's "credible testimony that she never intended for Scotland to be more than a
27 *temporary* location for herself and her children" as a relevant consideration but did not suggest
28 that it was dispositive. *Nisbet*, 124 F.4th at 586 (emphasis added). It also relied on the children's

lack of meaningful social connections, as well as their father's absence from their lives, which was relevant to the extent that he might have otherwise represented a tie between the children and Scotland if he had not been confined in a psychiatric institution and had formed a more significant personal connection with them.  *Id.* at 585.  Accordingly, while a merely "transitory" stay might be sufficient to *preclude* a finding of habitual residence under *Monasky*, 589 U.S. at 76, a "temporary" stay might or might not be consistent with habitual residence, depending on other circumstances.  As noted earlier, the Ninth Circuit agreed with the dissent that the record in the case could be read to support the conclusion that the children habitually resided in Scotland.  *Id.* at 589.

If this Court ultimately finds that either or both of the parties did not intend to remain in Germany, that would be one relevant consideration among many in determining the children's habitual residence.

### 3. Habitual Residence Is Not Amenable to Summary Judgment Under the Circumstances of this Case

As discussed above, habitual residence requires the Court to weight the totality of the circumstances, based on a "on a panoramic view of the evidence."  *Monasky*, 589 U.S. 68 at 82 (citation omitted).  Here, that determination will likely depend on which portions of that panorama the Court might find most relevant, and how the Court might assess the parties' credibility.  As the Ninth Circuit has noted, the broad legal standard at issue allows for cases where "a selection of facts in the record of this case [could] be read to support [more than one] conclusion," especially where credibility determinations are at issue.  *See Nisbet*, 124 F.4th at 589.

For the purpose of Respondent's Motion, viewing the record in the light most favorable to Petitioner, the parties had purchased property in Germany with an intent to live there, made long-term plans for their children's education in Germany, and moved all of their belongings to Germany.  They obtained long term visas with a path to legal permanent residence.  Respondent listed property she owned in California for sale, obtained a German bank account, and engaged with the local community.  Petitioner incorporated business entities, although he is still in the process of operationalizing them.  The children acclimated to Germany well: engaging in various

extracurricular activities, making friends at their preschool, and showing progress learning German.  Taken as a whole, they adapted with no more than the challenges that might be expected for any new immigrants who did not previously speak the local language.  True, Respondent had considered the possibility that the move to Germany might not work out (as she communicated to her friend and to A.D.P.'s teacher in the fall of 2023), and she later changed her mind about wanting to stay there as the parties' marriage deteriorated, but the children were effectively at home in Berlin for the nearly yearlong period they lived there, which made up a substantial portion of their young lives.  Viewing the record from that perspective, one might reasonably conclude that the children were habitual residents of Germany.  Respondent's Motion is therefore DENIED.

On the other hand, for the purpose of Petitioner's Motion, the Court must view the record in the light most favorable to Respondent.  From that perspective, the parties (or at the very least, Respondent) were not sure when they purchased property in Germany if they would live there or merely hold it as an investment.  They moved to Florida to have children, and when they started to plan a move back to Germany, it was intended merely as a trial period, perhaps no more than a few months, to see if it would save their marriage.  True, they made plans for their housing and their children's education, but that would be a responsible choice for even a short stay, and certainly if there was at least a possibility of staying longer.  Respondent never committed to remaining in Germany, and Petitioner retained strong ties to the United States, including operating multiple businesses in Florida—and representing himself as a resident of that state for the purpose of those businesses.  The entities that he established in Germany were mere pretext for a visa application, and the slow progress in operationalizing Petitioner's German business reflected his awareness that his family might not remain in the country.

Still viewing the record in Respondent's favor, the children were devastated to lose the company of their grandmother, who had lived with them in the United States and did not move with them.  They did not learn the local language, make close friends, or have a meaningful connection with any extended family members who lived in Germany.  They engaged in the activities their parents enrolled them in, but their young age limited the degree to which they could

personally form connections with a new country, and their parents still had ties to the United States.  Respondent realized that the move was not a success for her or the children and sought to return to California, but she had limited ability to do so when she was financially dependent on Petitioner.  After less than a year in Germany, when the parties' marriage reached a breaking point and Petitioner verbally lashed out at Respondent in front of the children, Respondent brought the children back to the country where they were born—the United States—to live close to their grandmother, who had moved to California.  Viewing the record from that perspective, one might reasonably conclude that the children did not sufficiently acclimate in Germany to establish habitual residence there.  Petitioner's Motion is therefore DENIED.

The Court notes that Petitioner has offered German court decisions finding that the children were habitual residents of Germany, though potentially based on a procedural default by Respondent, which she asserts resulted from a violation of due process due to ineffective service.  Regardless of whether the Court considered those decisions, they would not alter the conclusion that the panorama of evidence, taken as a whole, is amenable to resolution in favor of either party.  For the purpose of denying the present Motions for Summary Judgment, the Court need not and does not resolve the parties' dispute over whether it can consider those rulings.

### C.    Other Issues Addressed in Petitioner's Motion

Petitioner seeks summary adjudication that he had rights of custody under German law, that he was exercising those rights before Respondent removed the children to California, and that he did not consent to Respondent removing the children.

At the hearing, Respondent's counsel conceded that Respondent does not contest Petitioner's right of custody or exercise of such custody at the time of removal for the purpose of the Hague Convention, but argued that the Court need not and should not make any finding of Petitioner's rights under German law.  If the Court ultimately finds that the children were habitual residents of Germany, though, then Petitioner's rights under German law are an element of his prima facie case.  *See* Convention, art. 3.  And while it is possible that the Court would not need to reach such issues, Rule 56(a) of the Federal Rules of Civil Procedure allows a party to seek summary adjudication of a "part of [a] claim," as Petitioner has done here.  Fed. R. Civ. P. 56(a).

Precluding summary adjudication under any circumstances where an issue *might* not ultimately be necessary to a case would all but read out that portion of the rule, and is not consistent with its common application. Petitioner may therefore properly seek summary adjudication that he had and was exercising custody rights under German law at the time of removal.

Finding the issue appropriate for consideration, the Court GRANTS Petitioner's Motion as on the issue of custody rights under German law. The record is undisputed that Petitioner and Respondent were married at the time their children were born in 2020 and 2021, and they remained married at the time the children were removed from Germany. ECF No. 99 at 3-4 (Joint Pretrial Conference Statement). "Under German law, where parents are married at the birth of the child, they have joint custody over the child until the operation of law . . . or a court order terminates joint custody." *Krefter v. Wills*, 623 F.Supp.2d 125, 133 (D. Mass. 2009) (quoting *Kufner v. Kufner*, 519 F.3d 33, 39 (1st Cir. 2008)). Petitioner also offers declarations of German law by his German counsel Andreas Hanke, which is consistent with that authority. ECF No. 64, ¶ 19 (citing German Civil Code § 1626(1)). Respondent has raised various arguments as to the propriety of Dr. Hanke's declaration and what it might mean for any claim to the equivalent of attorney-client privilege under German law, but even if the Court did not consider Dr. Hanke's declaration, it can review the law itself. *See* Fed. R. Civ. P. 44.1; ECF No. 64-6 at 4; Federal Ministry of Justice, German Civil Code, https://www.gesetze-im-internet.de/englisch_bgb/englisch_bgb.html#p6445 [https://perma.cc/TCT3-LLSS]. Respondent has offered no authority to the contrary. It is therefore undisputed that by operation of law, Petitioner held custody rights under German Law at the time the children were removed.

The undisputed record also reflects that Petitioner and the children (and Respondent) were living together as a family before Respondent removed the children from Germany. "[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)). There is no evidence of such abandonment in this case. Petitioner is therefore also entitled to

18

summary adjudication that he was exercising rights of custody, an issue that Respondent does not dispute.

## V. CONCLUSION

For the reasons discussed above, both parties' Motions for Summary Judgment are DENIED on the question of whether the children were habitual residents of Germany at the time that Respondent moved them to California in March of this year. Petitioner's Motion is GRANTED as to summary adjudication that if the children were habitual residents of Germany, Petitioner had rights of custody and was exercising those rights at the time of removal.

**IT IS SO ORDERED.**

Dated: August 21, 2025

LISA J. CISNEROS
United States Magistrate Judge

19